UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF MISSISSIPPI
(GULFPORT-6 DIVISIONAL OFFICE)

| | |
|---|---|
| IN RE: | Case No. 23-50491-JAW |
| ESCAMBIA OPERATING COMPANY, LLC AND ESCAMBIA ASSET COMPANY, LLC, Debtor. | Thad Cochran U.S. Courthouse<br>501 E. Court Street<br>Jackson, MS 39201 |
| | May 13, 2025<br>1:00 p.m. |
| IN RE: EL DORADO GAS AND OIL INC., Debtor. | Case No. 23-51715 |

TRANSCRIPT OF STATUS CONFERENCE SET FOR EL DORADO GAS AND OIL; STATUS CONFERENCE ON THE JOINT TRUSTEE'S MOTION TO APPROVE COMPROMISE AND SETTLEMENT IN EL DORADO AND ESCAMBIA OPERATING
BEFORE HONORABLE JAMIE A. WILSON
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For Drew McManigle, Chapter 11 Trustee: | Jones Walker LLP<br>By: JEFFREY RYAN BARBER, ESQ.<br>JOSEPH ERIC BAIN, ESQ.<br>811 Main Street, Suite 2900<br>Houston, TX 77002 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail: jjcourt@jjcourt.com**

**(609) 586-2311 Fax No. (609) 587-3599**

APPEARANCES (Cont'd):

| | |
|---|---|
| For Parker & Son, Inc. and Parker & Son, LLC: | Silver Voit Garrett & Watkins<br>By: JASON R. WATKINS, ESQ.<br>4317-A Midmost Drive<br>Mobile, AL 36609 |
| For Florida Gas Transmission Company, LLC: | Watkins & Eager PLLC<br>By: JIM F. SPENCER, JR., ESQ.<br>Post Office Box 650<br>Jackson, MS 39205-0650 |
| | Katten Muchin Rosenman LLP<br>By: YELENA E. ARCHIYAN, ESQ.<br>2121 North Pearl Street, Suite 1100<br>Dallas, TX 75201-2591 |
| For Taslog Limited, LP: | Cloud & Willis, LLC<br>By: HARRISON WILLIS, ESQ.<br>3928 Montclair Road, Suite 227<br>Birmingham, AL 35213 |
| For Resources Strategies, et al.: | Baker Donelson<br>By: ALAN LEE SMITH, ESQ.<br>100 Vision Drive, Suite 400<br>Jackson, MS 39211 |
| For the U.S. Trustee: | Office of the U.S. Trustee<br>By: STEVEN USRY, ESQ.<br>501 East Court Street, Suite 6-430<br>Jackson, MS 39201 |
| For First Service Bank: | Butler Snow LLP<br>By: JOHN A. CRAWFORD, JR., ESQ.<br>P.O. Box 6010<br>Ridgeland, MS 39158-6010 |
| For Sehoy Energy Limited Partnership: | Wiener, Weiss & Madison<br>By: PATRICK LAWRENCE McCUNE, ESQ.<br>445 Louisiana Avenue<br>Baton Rouge, LA 70802 |
| For Dawn Ragan: | Hood & Bolen, PLLC<br>By: R. MICHAEL BOLEN, ESQ.<br>3770 Hwy. 80 West<br>Jackson, MS 39209 |

APPEARANCES (Cont'd):

| | |
|---|---|
| For Dawn Ragan: | Kelly Hart & Hallman LLP<br>By: KATHERINE HOPKINS, ESQ.<br>NANCY LEE RIBAUDO, ESQ.<br>201 Main Street, Suite 2500<br>Fort Worth, TX 76102 |
| For Metropolitan Life Insurance Company: | Adams and Reese LLP<br>By: TIMOTHY J. ANZENBERGER, ESQ.<br>1018 Highland Colony Parkway<br>Suite 800<br>Ridgeland, MS 39157 |

\- - -

**I N D E X**


| | |
|---|---|
| | **PAGE** |
| **WITNESS** | |
| DREW McMANIGLE | |
| Examination by Mr. Barber | 12 |

THE COURT: All right. Good afternoon, everyone. We'll go ahead and get started on the 1 p.m. docket. We've got the El Dorado Gas and Oil case, Case 23-51715, set on a status conference. And then we have some substantive matters in the Escambia Operating Company case, Case 23-50491.

So, I'm going to take appearances, and unless you tell me otherwise, I'm going to let your appearance be in both of the matters. Mr. Barber, you want to start us off?

MR. BARBER: Yes, Your Honor. Jeff Barber for Drew McManigle as Chapter 11 trustee for the Escambia estates. I'm joined on the phone by my colleague, Joseph Bain. And here in the courtroom is Mr. McManigle, the Trustee.

THE COURT: Thank you.

MR. WATKINS: Your Honor, Jay Watkins for Parker & Son, Inc. and Parker & Son, LLC.

THE COURT: Thank you.

MR. SPENCER: Good afternoon, Your Honor. Jim Spencer and Yelena Archiyan for Florida Gas Transportation. We are only in the Escambia Operating Company case.

THE COURT: All right. Thank you.

MR. WILLIS: Your Honor, Harris Willis here on behalf of -- go ahead.

THE COURT: I heard you, Mr. Willis. Thank you. Hang on just a second, I'm going to -- I've got a few more attorneys in the courtroom, but I'll go ahead and note your

appearance, Mr. Willis.

MR. SMITH: Yes, Your Honor. May it please the Court, Alan Smith on behalf of Resource Strategies, LLC, Resource Strategies III, LLC, American National Insurance Company, Briguna, LLC, and ATIC, that's A-T-I-C, Limited Partnership, in all cases. Thank you.

THE COURT: Thank you.

MR. USRY: Steve Usry with the U.S. Trustee's Office.

THE COURT: All right. All right. I'm going to just call out a couple of the -- the names. Let me see who's on the phone. Let's see. All right. Mr. Willis, I have you for Taslog.

MR. WILLIS: Yes, Your Honor.

THE COURT: Anyone here for First Service Bank on the phone?

MR. CRAWFORD: Jack Crawford with Butler Snow.

THE COURT: Mr. Sheehan, are you here today?

(No audible response)

THE COURT: Mr. Schwarick (phonetic)?

(No audible response)

THE COURT: Bradley Goldman (phonetic)?

(No audible response)

THE COURT: Patrick McCune?

MR. McCUNE: Yes, Your Honor. Patrick McCune on behalf of Sehoy Energy Limited Partnership, on the phone.

THE COURT: Thank you. Anyone else on the phone that needs to make an appearance?

MR. BOLEN: Mike Bolen for --

UNIDENTIFIED SPEAKER: Yes, Your Honor.

MR. BOLEN: -- for Dawn Ragan.

THE COURT: Oh. Hi, Mr. Bolen. Thank you.

MS. HOPKINS: Yes, Your Honor. Katherine Hopkins --

MR. ANZENBERGER: And Tim Anzenberger for Metropolitan Life Insurance Company.

THE COURT: Okay. Ms. Hopkins, I heard you. Mr. Anzenberger.

MR. ANZENBERGER: Yes. Present, Your Honor.

MR. McCUNE: And, Your Honor, this is Patrick McCune again. I'm so sorry to interrupt. I am only appearing in the Escambia Operating Company case.

THE COURT: Thank you.

MS. RIBAUDO: Nancy Ribaudo on behalf of Dawn Ragan, the Chapter 11 Trustee, is also attending via phone.

THE COURT: Thank you.

MS. RAGAN: And Dawn Ragan, the Chapter 11 trustee is on, Your Honor.

THE COURT: Thank you, Ms. Ragan. Anyone else on the phone that needs to make an appearance?

(No audible response)

THE COURT: All right. Let's go ahead and knock out

the status conferences on the joint trustee's motion to approve compromise and settlement in the El Dorado and Escambia Operating. Mr. Barber looks like he's going to start us off on that.

MR. BARBER: I'm going to start us off, Your Honor. Jeff Barber for Drew McManigle. We've been sort of kicking that can down the road. I've been talking to Mr. Smith who was the only objector. We think it would be prudent to kick it down the road a little further, basically since we need to get the sale, big sale, done. And then once that's done then we can either, you know, resolve that or actually set it for hearing, or wrap it into a plan, or however we want to go about dealing with that, if that's okay.

THE COURT: Mm-mm. All right. We'll circle back at the end and talk about dates.

MR. BARBER: Okay.

THE COURT: Ms. Hopkins or Ms. Ribaudo, Mr. Bolen, anything else you'd like to add to that status?

MS. HOPKINS: No, Your Honor. The trustees agree -- El Dorado trustee's agreeable to continuing that further while the Escambia estates resolve some of their matters.

THE COURT: Ms. Hopkins, do you intend to stay on the phone until the end of the Escambia matters or do we need to talk about some dates while you're on the phone?

MS. HOPKINS: Your Honor, I was not planning on

staying for the substantive portion of the hearing.

THE COURT: Okay.

MS. HOPKINS: We certainly can if needed. But, to the extent there's something we can discuss now, that would be helpful from our point of view.

THE COURT: I just need to know about how far you want to go out on the motion to approve compromise. You thinking June, July?

MR. BARBER: You know, actually, I'm thinking -- let's see, this is May. Actually, I like July. That actually, I think, works -- works best. It gives us plenty of time.

THE COURT: What about July 18th or July 22nd?

MR. BARBER: The 22nd works best for me. I'm actually going to be out-of-state on the 18th.

THE COURT: Ms. Hopkins, do you think July 22nd would work?

MS. HOPKINS: Yes, Your Honor. We've previously had some internal conversations about availability in July, and that July 22nd works for us.

THE COURT: All right. So, we'll reset the motion to approve compromise at Docket 833, the limited objection at 877 in the El Dorado, and the motion at 518, and the objection 541 in Escambia for July 22nd. All right. Anything else we need to take up before we get to the substantive motions?

(No audible response)

THE COURT: All right. Let's start with the sale motion. The sale motion is at Docket 623. The limited objection filed on behalf of Resource Strategies, LLC, American National Insurance Company, Briguna, and ATIC Limited Partnership at 639, the joinder filed on behalf of Taslog at 640, the limited objection at 749, the limited objection on behalf of Parker & Son at 751, the limited objection, another limited objection, on behalf of Resource Strategies Group 752, and the objection and reservation of rights on behalf of Sehoy Energy at 754. All right, Mr. Barber.

MR. BARBER: All right, Your Honor. Jeff Barber for the Chapter 11 trustee, Drew McManigle. By way of housekeeping matters, we did file yesterday proposed orders regarding both the sale and the assumption motion. Now, as you were reading the list of objections, I have to confess, Taslog threw me a little bit of a curve. I know that objection was filed early on. I sort of understood that to be that initial process and that objection was not renewed to the orders. So, in all candor, I've not spoken with Mr. Harrison, so apart from that, we actually have an agreement on all of the other objections.

THE COURT: Well, let me find that real quick. This is what I think happened on that, Mr. Barber. When we were here on that hearing, basically we resolved it --

MR. BARBER: Right.

THE COURT: -- in open court. But, we never withdrew

the motions. So, what I was going to do, if no party objects, is just to add the dockets. There's four dockets that need to be added to your order anyway, so we'll just add those two dockets in to clean it all up.

MR. BARBER: All right.

THE COURT: Because they were kind of orphan pleadings.

MR. BARBER: Right. And I -- clearly, I didn't clue in on it. And I was actually going to mention that I realized I'd left some of the docket numbers off, so I was going to need to clean the order up for that purpose. There also is one typo that someone brought to my attention where the word "not" was omitted, where it makes a huge difference. So, we're going to --

THE COURT: I flagged that one, as well.

MR. BARBER: -- clean that one up. All right. So --

THE COURT: That one's on Page 16.

MR. BARBER: Thanks to Mr. McCune for bringing that one to my attention. So, with that though, Your Honor, you know, unless there is an issue on Mr. Willis' side, we have a recent agreement and resolved all of the objections that are filed. I can walk the Court kind of through the general -- the generalities of it if you'd like, and just to give the Court some context perhaps for how we got here and what we're trying to do. Or I can just go ahead and call Mr. McManigle to the

stand to testify, however the Court wants to do it.

THE COURT: Let's check to see -- I want to make sure -- Mr. Willis, do we need to take up anything on your objection, or do you agree that your joinder at 63, we basically resolved in open court at the last hearing?

MR. WILLIS: Yes, Your Honor.

THE COURT: Okay. So, we'll just add that one back in.

MR. BARBER: All right. Good.

THE COURT: Let's go ahead and put your testimony on the record, Mr. Barber.

MR. BARBER: Okay. I call Drew McManigle to the stand.

THE COURT: Mr. McManigle, Ms. Ramage will swear you in.

MR. McMANIGLE: I'm sorry, Your Honor?

DREW McMANIGLE, CHAPTER 11 TRUSTEE, SWORN

EXAMINATION BY MR. BARBER:

Q Would you state your name for the Court, please?

A Drew McManigle.

Q And what is your relationship to the Escambia cases?

A I'm the Chapter 11 Trustee of Escambia Operating, Escambia Assets, and Blue Diamond.

Q And, Mr. McManigle, could you just very briefly describe the condition of the assets when you took over as trustee?

A First, when I took over in October of 2023, the condition of the field, the oil and gas field and the gas processing plant, was grim. They were unsafe. They were operating in an unsafe manner. As an example, there hadn't been a fire safety inspection for over a year. There were oil and gas monitors at the wellheads which didn't work. At the Flomaton plant, which is a remote facility, the servers and the monitors were completely out. There were just a plethora of issues. And a lot of those, I won't bore the Court today, but were contained in my trustee reports, the four trustee reports that I filed.
Q Would you say the condition was worse than you expected when you took over?
A Yes. Shockingly.
Q And did you have access to all the books and records when you took over?
A We did not, initially.
Q And, as you recall, we had to have a two-day trial to try to get the rest of the books and documents, is that right?
A That's correct.
Q Now, did you encounter operational issues as the case progressed?
A We had operational issues because the producing gas wells were not serviced properly, as we would in operating a oil and gas well. They require periodic service like anything else, especially if they're H2S, which is highly corrosive. So, some

of the production was beginning to go down, including on the booth well, which was our best well at the time, producing a significant amount of gas into the plant. And then secondarily, before my tenure, under Mr. Schwarick's tenure, a perfectly good oil and gas well, which was producing about 64 barrels a day, was ruined through the efforts of his employees and consultants. So, you know, we had two steps back before we ever got started.

Q And tell me a little more about the booth well. What happened with that well?

A Well, as we were assessing the plant and the wells, the booth well production began to decline. And so we did our homework and in consultation with, you know, consultants in the field who knew the field and the wells and Escambia's employees, we determined to undertake a workover of the booth well. It was -- we knew it was going to be a difficult workover just because of corrosion. The depth of the well is over 15,000 feet deep, and the lack of service on that particular well.

So, we ran into some issues in getting the packer to release. And a packer's exactly what it sounds like. It packs off one zone from another. And that's not all that unusual. However, on January 1st, 2024, the well servicing contractor made some errors and dropped a thousand feet of pipe in our hole. Since there wasn't a fluid column to slow the pipe down,

the pipe that was dropped pushed all of the pipe, the bottom hole assembly, most likely the packer, and God only knows what else, down to the bottom of the hole.

And although we then began a very costly and several month effort to fish the pipe out of the hole and, you know, the pipe was corkscrewed, broken in bits and pieces. We got down to about 12,450 feet, give or take, and we just couldn't go any further. And by that time, we couldn't get down any further, and the costs were so prohibitive at that point, we abandoned the well. And then later we got the –– we assessed what had happened. We assessed what we could do, what we might be able to do, if a sidetrack was undertaken, and of course we didn't have the money for that.

But, we looked at it from all angles. And subsequently made the very difficult decision to have the well temporarily abandoned and we got approval for that by the Alabama Oil and Gas Board. And that literally changed the projection of the case because the wells in total produce a volume of gas to the plant, and let's say it's, you know, 10, 12, 16, 18, 20, 25 million cubic feet. As that gas produces to the plant, and we were down, I think, to the booth well, maybe about 12, 15, 16 MCF, we were having to buy additional gas to feed into the plant to operate it as efficiently as we could.

As soon as we took the booth away, then the gas from the other wells dropped down. And at some points over the

last, you know, few months, we were running 8, 7, 8, 9 million cubic feet a day, which is just about the minimum to keep it alive. And we had assessed literally all of the other wells about what we could do in terms of remedial service work with coil tubing, which wells needed workovers. You know, we got AFEs for those. We assessed and looked it from every angle, but, you know, unfortunately, you know, we just didn't have the money to do anything.

And then subsequently, we were successful in shutting down the plant last summer and changing out all of the sulfur regions, which had to be done because, a) They had expired, b) -- or the catalyst, I should say, and b) It was increasing our emissions from the plant. So, we had to -- we had to do a shut-down of the plant where we did a lot of different maintenance, smaller maintenance items, and we replaced the catalyst and we successfully restarted, and we were back in business and operating a little bit more efficiently, notwithstanding the shape of the wells.

Then on January 1st of this year, we blew a pump. And it was one of our major pumps at the plant. So, we shut the plant down, undertook repairs of the pump, which took two or three efforts to get it right. And by that time, literally a month had gone by, and a month of revenue was gone, and we simply did not have the cash to restart the plant, so we put into a warm shut-down and then pivoted from what had been a

pretty vibrant sales effort or a marketing effort by our investment banker, SSG, which had been going on for three, four months, to an auction style by EnergyNet, which was approved by the Court, which we accomplished in about 30 days to get the plant and the field sold.

Q And, do you remember, you mentioned SSG, do you remember how many non-disclosure agreements were signed by prospective purchasers through SSG?

A Between, I think it was 219 at SSG. They contacted -- they contacted many, many parties, both from private equity, oil and gas company, prospective investors. They even contacted Exxon. They contacted a broad array and they actually did a great job. And our folks at MACCO and at the plant did a great job of putting together data for the data room so that anybody could go in and quickly assess the field, the plant, you know, and the values.

And that included, you know, a reserve study that we had done under my auspices to make a determination of what we thought, where's the value in this field, where's the value in this plant. You know, because we -- it was unclear to us, because it had been sold so cheaply. And you had 13,000 acres of potential drilling rights and multiple leases and a plant, you know, on 320 acres of ground that you cannot build in this country again, because of the type of regulatory nature that exists. You know, that has some value.

And we believe that it did, and sure enough the reserve study showed that it did have value. And reserve studies are both art and science, so it was, you know, it's -- the beauty is in the eye of the beholder. But, we believe there was value there, which is one reason we worked so hard to maintain that value for, you know, the creditors and the working interest owners. The royalty interest owners might have a better day than they've had in the past.

Q But, SSG was unable to produce any material bidders, is that right?

A No, they were not. We had -- we had tire kickers. There were a lot of people who had come and kicked the tires and go through the process, look in the data room, and then make an offer for, much like Mr. Schwarick's, you know, a million dollars or a million and a half for the whole thing, which we found unsuitable. We had two or three instances where we thought we had some very lucrative business partnerships with third parties who had processes and/or businesses that would fit well into the plant's production of gas, various gases, and sulfur. And we worked very hard to try to get those to fruition, but unfortunately, none of those -- none of those did, and those parties went away.

On the EnergyNet side, and EnergyNet has been in business for over 25 years. They have, I think it's 60,000 pre-qualified prospective purchasers in their system. I think

there were over 416 unique views of the Escambia assets. And I believe it was 200-and-something more focused views, which resulted in, you know, a bid of $3 million. We had put a two and a half million dollar reserve on the assets and we got a $3 million cash bid.

Q And that bidder was Stream Energy, is that right?

A That's right.

Q And is it your understanding that Stream has formed an Alabama LLC to take title of the assets if the Court approves the transaction?

A That's correct.

Q And that name of that entity is SEP Escambia, LLC, is that right?

A I believe that's right.

Q All right. And after the EnergyNet commission is paid, what's the approximate net to the estate?

A The estate will net out about $2.8 million.

Q Now, were all of the energy related assets included in the auction or were any assets reserved?

A No. What we had done, and this is in connection with one of the parties that we were -- thought we were going to do a rather unique carbon credit transaction with. So, we carved out four wells, if you will, that actually -- the wellbores. And a wellbore is simply exactly that. It's the physical hole in the ground down to the total depth, both cased and uncased,

in a producing or nonproducing well, as it may be. And those wellbores were going to be used in a carbon credit transaction.

Subsequently, those parties weren't able to get to an agreement after we had worked for weeks and weeks and weeks to try to get them to the table to sign up so that we could get started on that. That fell apart. And so, you know, we had already –- we were already in the EnergyNet sale, so we just left that and we intend to add two of those wellbores back into the sale. And keep two of the wellbores out.

MR. BARBER: Your Honor, if I can make a brief footnote. We are going to be filing an emergency motion to get those two bores included into this transaction. We'll be asking you to shorten time and everything. And it's –- I don't think it's going to be controversial. But, we did learn that the purchaser actually needs those two. So, we'll be having that filed fairly shortly, hopefully within the next couple of days. I meant to mention that at the beginning and I overlooked it.

Q Now, the purchaser has also asked you to assume and assign to it the construction operating agreement, the joint operating agreements for the wells, as well as the underlying mineral leases, is that right?

A That's correct.

Q Now, is the sale going to generate enough money to cure outstanding defaults under all those agreements?

A No.

Q All right. So, how do you propose to cure those defaults?

A Well, what we're planning on doing, because we have several buckets, and they're still viable buckets. We'll have the $2.8 million in cash. I have almost a $13 million lawsuit against the oil well servicing contractor who dropped the pipe in the hole. And while everybody in this courtroom and the Court itself knows litigation is what it is, I am highly confident in the facts and circumstances of that litigation, which is set for trial in federal district court in Mobile for April, unless there's a significant settlement reached before then.

Q And that's of next year?

A Exactly. April of next year, April of 2025. And then we also have the opportunity to avail ourselves using two of these wellbores on wells that are already not producing to try to generate some revenue from those. So, what we have is -- and it's not -- it sounds like hope, but it's not. It's actually fairly rational because we've done our homework, both in terms of -- if the litigation reaches fruition and if this happens, or if the litigation doesn't, or if the litigation works but the carbon credit thing is less than we think it is. So, we have two buckets out there. We just don't know what they're filled with just yet.

Q And carbon credits, without getting into too much

scientific detail, could you explain what that involves?

A And I will be the first one to say my guys at MACCO, Pablo Bonjour and Alex Vopat, know this better than I do. But, essentially, if you have what was once a producing oil or gas well, or other things, I believe, you can –- and if you flood those wells and they are no longer going to be utilized, there is a statistical or a mathematical equation that can be applied to what the wells produced and what amount of carbon is being eliminated from their production, as I understand it.

And so, then once you do that and then there's a –- there's a society or a group that verifies that, and those are worth money, because other corporations that are, you know, emitting whatever in the atmosphere, you know, they'll buy these carbon credits for their own benefit. And they can have substantial worth we estimate, you know, these two wells that we are planning on plugging and abandoning and using to gain these carbon credits could have a value of somewhere between 0 and $16 million.

Q So, it's not a certainty, but certainly more than a hope and a prayer?

A More than a hope and a prayer.

Q Now, you said a minute ago that you will not have money at confirmation to be able to pay all the cure costs and what not. So, what exactly are you planning to do by way of a confirmed plan?

A Well, recognizing that we need to get this case resolved one way or the other, and the simple answer, and I said this I think the last time I was in court, is if –– if none of this works, this, you know, and if the sale's not approved for some reason or –– then this is just a Chapter 7. And all the value and all the opportunities the parties might have had is just going to go away. Including for the employees and everybody else at the plant.

So, what we've developed is a waterfall so that as –– so we're going to propose a liquidating plan, together with a liquidating trust, and then the liquidating trust will have the rights and remedies to pursue litigation, and we believe there's some litigation out there that might have merit that could yield some additional revenue to the estate.

But, these –– these other pieces that I've spoken about and testified to, just recently the carbon credit and the well servicing litigation, when those come in, once those are in and we know what's in the buckets and how much the buckets actually are and what we have in total, then we've devised a waterfall that would be attached to the plant so that everybody can see it, and it's very transparent in terms of, okay, we've got, you know, X dollars, we know what our administrative costs are, we know what we've got to do to get, you know, to a plan that can be confirmable in paying the priority and the admin costs. And that water falls down through three tranches, I

think, of payments at various percentages.

Q And -- yes, Your Honor?

THE COURT: Mr. Barber, I did have a question on this point. Because I believe the waterfall that you're talking about is actually attached to the redline order. And I'm looking at the redline at 7714. It's the order granting the trustee's motion to assume and assign potential executory contracts and unexpired leases.

I think that's where you were talking about some of these proposals that you intend to put in your plan. I did have a question about -- I see the waterfall structure, but the payments are in pari passu, and I had a question about why is it that way, as opposed to, like, on a pro rata basis.

MR. BARBER: Sure. For one thing, we don't -- it's going to take some time to figure out exactly the dollar amount of various claims.

THE COURT: Right.

MR. BARBER: We're going to be negotiating all of that. And so, rather than waiting until all claims are fully, you know, adjudicated and dollar amounts and what they are, it just seemed like this was a better sharing mechanism. And I would also point out that, as the Court probably saw, in that second tier of the admin claims, all are going to be taking a, you know, 30 percent, you know, we're going to wait --

THE COURT: Right.

MR. BARBER: -- on 30 percent. And then share with the others. So, it seemed to be an equitable way of trying to get payments to as many creditors as possible. So --

THE COURT: Then, what I was looking at, and I'm sorry to get you off track, Mr. Barber. Holders of Series B2. These are the post-petition royalties.

MR. BARBER: Yes.

THE COURT: And Mr. Smith has a couple of these groups. My first question is, do we owe post-petition amounts to this group?

MR. BARBER: Yes.

THE COURT: The post-petition? Okay.

MR. BARBER: Yes.

THE COURT: And really, how many groups are we talking about?

MR. BARBER: Well --

THE COURT: Everybody represented -- everybody represented, in other words, or do we still have a lot of these interest holders that are not represented and haven't appeared in the case?

MR. BARBER: So, I think most of the working interest owners are represented. Now, royalty owners would be somewhat of a different story. But, the first thing I would like to just make sure the Court understands is, this is a waterfall that the working interest owners and the trustee put together

as something that they're going to try to see happen. Nothing in this cuts off the rights of creditors to object to the plan. We're not asking you to pre-approve a plan or anything like that. This is just something we all came up with as a way of trying to get us over this hump and try to get --

THE COURT: No, and I think you made that clear in the proposed order.

MR. BARBER: Okay, good.

THE COURT: It's definitely in the proposed order that this is not the plan. I'm not ruling on the plan.

MR. BARBER: Right.

THE COURT: Everybody reserves their right to object. I was just curious how we came up with that.

MR. BARBER: So, that's -- and we were working on it all through the weekend. A lot of effort went into it.

THE COURT: Thank you.

MR. BARBER: We actually just covered a whole lot of questions, so let me just kind of fast forward through this.

BY MR. BARBER:

Q Mr. McManigle, have you notified the appropriate regulators of this proposed transaction?

A We have. I've spoken several times to the general counsel at the Alabama Oil and Gas Board, and I testified in April at the Alabama Oil and Gas Board hearing. They wanted to have an update on the Escambia case. And so I went to Tuscaloosa. And

we talked about where the plant was, where the field was, what our plans were, and the sale process. And then I met with several of the Board members after the general meeting to discuss some of those details.

And also at that meeting, I met Mr. David Elks (phonetic). Mr. Elks is one of the principals of the purchaser. He was also at the Alabama Oil and Gas Board meeting in April, and he introduced himself. And I believe he also met with the –– some members of the Alabama Oil and Gas Board to introduce himself. Additionally, we notified ADEM. And just three days ago, I talked to ADEM's general counsel and brought Ms. Frank up to speed on where we were and, you know, where we were going.

Q And is that Alabama Department of Environmental Management? Is that the acronym?

A Correct.

Q Okay. And has the Oil and Gas Board established a hearing to consider the transaction?

A We did. We let them know the date of the sale, the date of the hearing, and the date of the proposed closing. And I think Mr. Elks' group and I were asking for a hearing at the earliest possible convenience, because I believe there's going to be a special hearing. And they have set one for June 16th.

Q So, if there's a slight lag between closing and the official approval by the Board, what is your proposal for

handling that?
A Well, actually, I met with Mr. Elks. I was at a mediation in Mobile on the litigation and –- last week. And we did talk about the transition. And we both feel that even –- even though the sale closes but I'm still the official operator, under my authority as the Chapter 11 trustee, using my business judgment, we can work through a viable transition period where –- where they begin to pay, you know, for the cost of the, you know, payroll and the bills that are accrued by the plant.
And begin, you know, a thoughtful, safe, prudent business, you know, an operations transition to them as they begin, prior to them being formally approved by the Alabama Oil and Gas Board. I'm comfortable with that. It makes perfect sense. I'm comfortable with the purchasers. They have decades and decades of oil and gas experience, including building plants like this. I, you know, they have been during this process clear and transparent about what they want to do and their plans. And I think it's a good plan and I'm happy to support that.
Q So, do you believe that the purchaser has acted in good faith in negotiating the deal that's before the Court today?
A Absolutely. In such good faith that the purchaser, because the estate has had such limited cash, that we've been holding onto. The purchaser actually contributed about $31,000 through the estate, without any strings attached whatsoever,

23-50491-JAW Dkt 799 Filed 05/23/25 Entered 05/23/25 02:25:32 Page 29 of 40



just so we could cover some expenses that we needed to do. So, I believe they have been acting in good faith and will continue to do so.

Q And have you investigated to make sure that the purchaser has no connections to prior management of the debtors?

A That's correct. They have no connection other than, I believe, Mr. Elks had had conversations because he's been looking at the Escambia opportunity for some -- some period of time.

Q But, Mr. Schwarick or any of his relatives, no one's involved in the purchaser, so far as you know?

A No, they are independent -- they are independent parties.

Q Okay. Do you believe that the purchaser will be able to perform adequately under the agreements that are being assumed and assigned?

A I do. They formed -- to my understanding, they formed a fund to purchase the assets and their intent is to operate it and to drill new wells and to do workovers, and do the necessary remedial work on the existing wells to get the plant back up and running, you know, efficiently as possible.

Q Do you believe that the sale before the Court today is in the best interest of the estates and creditors?

A Absolutely.

Q And is it your business judgment that this is a good deal for the estate and the creditors?

A Absolutely.
Q Mr. McManigle, what is the alternative if the sale is not approved?
A The case converts to a Chapter 7, candidly, today. If for some reason this sale isn't approved, I would ask the Court at this point to convert this case. There's just -- there's -- we don't have enough cash to make another payroll. And, you know, once again, as I've done now for, what, 16, 18 months, you know, we're dealing with, all of the wells are shut in. We're still dealing with, you know, H2S. We're dealing with the plant, you know, the egress of warm shut-down. You know, we have employees at the plant. You know, it's a difficult situation and I just don't see any other viable alternative.

MR. BARBER: Your Honor, I have no further questions.

THE COURT: Any cross exam?

(No audible response)

THE COURT: Mr. Barber, I had one follow-up question. One of my questions was about the transition period which you covered, and I appreciate that. Are the -- are the few employees that you have left, I do remember that you had to furlough some employees. Are the employees that you have left, have they been informed of this transition period, that it's going to be a little bit before the new purchaser actually takes over operations officially?

THE WITNESS: Yes, Your Honor, they actually have.

The purchaser has been to the plant on more than one occasion to interface with the employees. They have actually –– and the contribution that they made, they have actually brought back some of the employees that we furloughed. And their intent, to my understanding, is to bring back all of the employees that had been furloughed, you know, to have a full complement if the full complement isn’t there.

But, all of the employees had been aware of what we’ve been doing during the course of this sales process, including our regional superintendent at the plant, who I’ve instructed to notify the employees. So, I believe that everyone knows what’s going on, and I can only say the -- around that (indiscernible), if something happens, everybody’s going to know about it in about ten minutes.

THE COURT: And my only other question was, we have the litigation in Mobile. We’ve got the two wells that we’re going to look at, obtaining carbon credits for. Other than that, have we sold all of the, what I would call, the sticks, the vehicles, the personal property? Whatever is left that’s not part of this sale, has everything else been sold?

THE WITNESS: Yes, ma’am.

THE COURT: Okay.

THE WITNESS: The real –– two pieces of real property, the assets that we sold to an auctioneer that the Court approved, all that’s been completed. We have avoidance

actions. Those are ongoing, and we've made some recoveries in the avoidance actions, and those will continue. And then, you know, we have claims objections and those types of things as well to, you know, as we clean the rest of the bankruptcy up, once we're formally out of operations.

THE COURT: Mr. Barber, that's all I had.

MR. BARBER: Okay. Thank you, Your Honor.

THE COURT: Thank you. Thank you, Mr. McManigle. You may step down.

THE WITNESS: Thank you.

MR. BARBER: Your Honor, I was -- I was going to ask that when we clean up the two orders, if you're inclined to enter them, I did not ask -- I did not set up signature blocks for all the objecting parties. I can do that if you would like. Or if you just want to have people stipulate on the record, however the Court wants to handle it.

THE COURT: Are there any other substantive additions to the orders?

MR. BARBER: Other than cleaning up the docket numbers and adding the word "not", that's all I know of.

THE COURT: Let me ask. Any -- any other party have anything that they need to add into the order? Any objection with the redline or the proposed order that's been circulated? Mr. Smith?

MR. SMITH: Thank you, Your Honor. Alan Smith on

behalf of Resource Strategies and the other creditors that I've identified. Now, we just want to on the record and confirm that we are in agreement with the proposed sale and along with the contract assumption based, and we're willing to withdraw our objections in reliance on the terms and conditions that are stated in the proposed order. It says Docket 771-3 and 771-1 as filed by the estate yesterday.

And, specifically, included in that reliance would be in the waterfall that's been discussed here today, as far as how claims were proposed to be paid. And there are some stipulations attached to that that are built into in. We're acting in reliance on those stipulations in agreeing to withdraw our objections. Thank you, Your Honor.

THE COURT: Anyone else need to be heard?

MS. ARCHIYAN: Good afternoon, Your Honor. Yelena Archiyan of Katten Muchin Rosenman on behalf of Florida Gas Transmission Company. As Your Honor mentioned at the beginning, we filed an objection, a limited objection, in reservation of rights, to the sale motion at Docket Number 749. I'm happy to report that our objection has been fully resolved, with the inclusion of language in Paragraph (c) of the latest version of the proposed order, which was filed last night at Docket Number 771.

I'm happy to walk Your Honor through the language if that would be helpful. But, I will note that it's been agreed

to by the Trustee, Stream Energy, and obviously, Florida Gas. And we're also happy to withdraw our objection or sign the proposed order or however Your Honor wants to proceed.

THE COURT: I've reviewed it. If it's the agreement, then I don't have any issue with it.

MS. ARCHIYAN: Perfect. Thank you very much, Your Honor.

THE COURT: Is there anyone on the telephonic line that needs to be heard?

MR. McCUNE: Your Honor, this is Patrick McCune for Sehoy Energy.

THE COURT: Thank you. Go ahead.

MR. McCUNE: Yes, Your Honor. We have the objections to the sale motion at 754, an objection at 755 to the motion to -- for the assumption permission to assume and assign. Counsel for the trustee and the purchaser have worked to include language that was included in the notice to filing proposed orders at 771 and the attachments thereto, that resolve our objections.

And I would further add, we drew comfort from the testimony today, that the intention is to assign the underlying mineral leases as well to that clarification. And that the waterfall provision that's attached is subject to objection by people at the plan stage. It's not binding at this point. It's a proposal.

THE COURT: Yes, you are correct.

MR. McCUNE: Thank you, Your Honor.

THE COURT: Anyone else on the phone wish to be heard?

(No audible response)

THE COURT: All right, Mr. Barber, you want to -- I have just a few small edits in your sale order. Let's make sure we have all of our pleadings captured. On Page 10 -- not Page 10, your Footnote 10.

MR. BARBER: All right.

THE COURT: I think we need to add 639, 640, 642, and 643. Ms. Ramage, was that all of them?

COURT CLERK: Yep.

THE COURT: Okay. You got the revision on Paragraph (p). You're going to add in the word "not". Paragraph (t), it's on the redline Page 18. The last bit of that paragraph. Mr. Barber, I can't tell other agencies what they can and cannot do with the order. So --

MR. BARBER: All right.

THE COURT: I'm fine with saying, and I think this is kind of the gist of it, the sale order is -- it's to be used as -- to the extent you need to record it, to effectuate the sale, there's no problem with that. But, I can't order other state and local and federal agencies to do or not do something. So, I think we can just reword, kind of rephrase Paragraph (t).

And the same with Paragraph (x). I can't direct these federal, state, and local government agencies to accept it for filing.

MR. BARBER: All right.

THE COURT: My note was, I just changed, this order may be used and filed in any federal, state, or local agency to consummate and complete the transactions contemplated herein. I just kind of reworded it so that the bankruptcy court wasn't telling other agencies what they can and can't do.

MR. BARBER: I would like to, of course, run that by purchaser's counsel. Because they --

THE COURT: Okay.

MR. BARBER: -- approved this language so --

THE COURT: Understood.

MR. BARBER: -- but, I don't think it's a problem.

THE COURT: It just gets to be, what am I going to do if some agency says, no, we don't file it that way? That's it. That's all the revisions I had. Anybody else have any other revisions, issues, before we conclude today?

MR. BARBER: I will endeavor to get that uploaded to the Court this afternoon or latest, first thing in the morning.

THE COURT: All right. And did we decide? The objecting parties, do you want signature blocks or are you fine with Mr. Barber filing the final version as is?

MR. WATKINS: Your Honor, on behalf of Parker & Son entities, we would be fine with an eSignature with permission.

THE COURT: Okay.

MR. BARBER: I'll just add all those in then if that's all right.

THE COURT: All right. So, if anybody has an objection to an eSignature, speak now.

(No audible response)

THE COURT: All right. That'll save you a little bit of time, Mr. Barber.

MR. BARBER: Thank you.

THE COURT: So, the Court will enter an order, enter the order approving the sale and the motion to assume and assign the executory contracts and unexpired leases. That gets us to a little bit of housekeeping for scheduling coming up, Mr. Barber.

THE BARBER: All right.

THE COURT: We have -- all right. At our last conference we had talked about amending schedules. Do you still intend to amend the schedules?

MR. BARBER: I don't think we're planning to amend them. We really did a kind of a herculean effort, and I think we are comfortable. And anything that's not accurate, we'll probably resolve by filing objections to claims.

THE COURT: Anyway.

MR. BARBER: Or, more particularly, negotiating with people to try to resolve.

THE COURT: Okay.

MR. BARBER: I don't think we're anticipating filing amended order.

THE COURT: All right. So, we had talked about doing a status conference with El Dorado on June 3rd. But, it seems like we had -- Candice, didn't we have something else that --

(Court/clerk discussion)

THE COURT: There's an application to employ. I think --

MR. BARBER: (Indiscernible).

THE COURT: Yes. That's set. And I thought there was something else, Candice.

(Court/clerk discussion)

THE COURT: Oh, it's not them. Well, my thought is, today we should push the status conference and let the sale close, given that there's going to be a little bit of additional transition time. Because we need to go back and loop these two other wells in. Let's just table the status conference and see where we are. That leaves the -- really the next thing coming up will be that application to employ.

MR. BARBER: I've not spoken with Mr. Sheehan about it. We kicked that can down to June. I really was trying to get past this. But, as of right now, it's still on. I'm not opposed to pushing it out.

THE COURT: Well, and if that's the only thing that's

going to be on that day, maybe we should push it to at least the July 22nd date, so that we're not traveling when we don't really need to be.

MR. BARBER: That would actually work much better for us.

THE COURT: Well, if you want to mention it to Mr. Sheehan.

MR. BARBER: Sure.

THE COURT: That'll save him a drive. I think everything else I have is actually related to El Dorado. And then, Mr. Barber, when do you think this plan is coming?

MR. BARBER: I don't know.

THE COURT: Okay.

MR. BARBER: In all candor. I mean, we have -- we know what we want to do, and we've got a thousand of them on our system. We can, you know, pull and everything. I think we certainly want to see this sale close first. I think that's the key piece. So, I would like to say we could probably get a file -- a plan on a file by early to mid-June. Mr. Bain may kill me, but --

UNIDENTIFIED SPEAKER: (Indiscernible).

THE COURT: What did you say, Mr. Bain?

UNIDENTIFIED SPEAKER: (Indiscernible).

THE COURT: I don't know if that was Mr. Bain. Someone's not on mute.

MR. BARBER: I would estimate we could probably get it done by mid-June --

THE COURT: Okay. All right.

MR. BARBER: -- if not sooner.

THE COURT: Well, yes, the sale is primary. I was just curious. All right. Anything else that we need to take up while we're all here?

(No audible response)

THE COURT: We'll be adjourned. Thank you, all. Have a good afternoon.

UNIDENTIFIED SPEAKER: Thank you, Your Honor.

* * * * *

**C E R T I F I C A T I O N**

I, KIM WEBER, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

/s/ Kim Weber

KIM WEBER

J&J COURT TRANSCRIBERS, INC. DATE: May 22, 2025